[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 25, 2008
THOMAS K. KAHN
CLERK

No. 06-13614

D. C. Docket No. 06-00017-CV-C

BOARD OF COMMISSIONERS OF
THE ORLEANS LEVEE DISTRICT,

Plaintiff-Counter-Defendant-Appellant,

versus

M/V BELLE OF ORLEANS,

Defendant-Counter-Claimant-Appellee.

Appeal from the United States District Court
for the Southern District of Alabama

**(July 25, 2008)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and FORRESTER,* District Judge.

---

*Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

FORRESTER, District Judge:

Appellant, the Board of Commissioners of the Orleans Levee District ("the Board"), appeals from the district court's order granting Appellee, M/V Belle of Orleans', motion to dismiss for lack of admiralty jurisdiction and from the district court's order denying Appellee's Rule 59(e) motion to alter, amend or vacate the order to dismiss.[1] The Board sought (1) a maritime lien against the Belle of Orleans to secure payment for dockage, wharfage, utilities, and other charges pursuant to a lease between the Board and the Belle of Orleans' owners, Belle of Orleans, L.L.C., and (2) damages resulting from the Belle of Orleans' collision with the piers, docks, and other structures of South Shore Harbor Marina ("the Marina") during Hurricane Katrina's landfall. The district court found that the Belle of Orleans was not a vessel, that the lease between the Board and Belle of Orleans, L.L.C., was not a maritime contract, and therefore, it had admiralty jurisdiction over neither the Board's tort claim nor its contract claim. The district court denied the Board relief under Rule 59(e).

For the reasons set forth below, we AFFIRM IN PART AND REVERSE IN PART the district court's order and hold that (1) the Belle of Orleans is a "vessel" for purposes of establishing admiralty jurisdiction; (2) the district court improperly

---

[1]*Bd. of Comm'rs v. M/V Belle of Orleans*, 439 F. Supp. 2d 1178 (S.D. Ala. 2006).

determined that it lacked admiralty jurisdiction over the Board's tort claim; (3) the district court improperly refused to issue a writ of attachment under Rule B of the Supplemental Rules; and (4) the district court properly dismissed the Board's contract claim for lack of admiralty jurisdiction because the lease between the Board and Belle of Orleans, L.L.C., while partially maritime in nature, is not a maritime contract for purposes of creating a maritime lien.

## I.    Background

### A.    Facts

In 1995, Belle of Orleans, L.L.C. ("the Owner"), purchased the Belle of Orleans, a fully operational, steel-hulled paddlewheeler vessel, from Avondale Shipyard to conduct gaming cruises on Lake Pontchartrain. The Belle of Orleans is a "riverboat," which Louisiana law defines as a paddlewheel-driven "vessel," of at least 150 feet, that carries a valid certificate of inspection from the Coast Guard for the carriage of a minimum of 600 passengers, and "is of such type and design so as to replicate as nearly as practicable historic Louisiana river borne steamboat passenger vessels of the nineteenth century era." La. R.S. § 27:44(23).

The Board is the governing authority of the Orleans Levee District, a political subdivision of the State of Louisiana, which in addition to monitoring the district's levee system, owns and administers the South Shore Harbor Marina ("the

Marina"). The Owner entered into a Lease Agreement ("the Agreement") with the Board for the use of "certain portions of land, wharf and water bottom in the Marina located on the South Shore of Lake Pontchartrain."[2]

The original term of the Agreement was to run until 2003, and the parties had four ten-year options to renew. The Agreement stated that "the leased premises [was] to be used solely and exclusively for the operation of a riverboat gaming facility, a passenger terminal, related services and attendant parking facilities." The leased premises included five parcels of land: (1) 0.854 acres, described as "[t]he proposed mooring berth for the riverboat casino and the right of exclusive use of the adjacent wharf area"; (2) 0.418 acres, described as "the small parking area adjacent to the mooring berth"; (3) 2.087 acres, described as "[t]he site of the proposed passenger terminal building"; (4) "approximately 6.2 acre[s] [of] undeveloped land area"; and (5) 4.68 acres out of parcel 6E.[3] The Agreement called for a quarterly rent, with an additional payment of five percent

---

[2]The Board entered into the original lease with Star Casino, Inc., on February 18, 1993. On August 27, 1993, the parties amended the lease to substitute Showboat Star Partnership for Star Casino and to add an additional parcel. Showboat Star Partnership assigned and transferred to Belle of Orleans, L.L.C., all its rights, title and interest under the lease on February 15, 1995, and the parties again amended the lease.

[3]The parties amended the lease and removed 6D to add 6E, which was 4.68 acres. The Board and Belle of Orleans, L.L.C., executed another lease on January 23, 2004 in which the Board agreed to lease the interior of the Marina Center and certain other exterior property. The Marina Center rent was $11,418.91 per quarter.

of the monthly gross gaming revenues and with a minimum monthly percentage rental. The Agreement also required the lessee to pay for utilities provided to the property.[4] The Agreement provided for penalties if the lessee failed to pay rent or discontinued the use of the premises.[5] The Agreement also specified how the parties would handle any damage to property.[6]

---

[4]The Agreement provided:
B. The Lessee shall be required to pay for all improvements to the Leased Property required to accommodate its total operation including water, electrical, sewerage, drainage or other services. All lease sites will be metered separately.

[5] Should the Lessee at any time violate any of the conditions of this lease, including failure to pay rent, or discontinue use of the premises for the purpose for which they are rented, or fail to pay other expenses assumed under this lease, punctually at maturity, as stipulated, and should violation continue for a period of fifteen (15) days after written notice has been given Lessee, then, at the option of the Lessor, the rent for the whole unexpired term of this lease at once becomes due and exigible; and Lessor shall have the further option at once to demand the entire rent for the whole term, or to immediately cancel this lease, all without putting Lessee in default, Lessee to remain responsible for all damages or losses suffered by Lessor, Lessee hereby assenting hereto and expressly waiving the legal notices to vacate the premises.

[6] XXI.
Both parties, irrespective of any negligence whatsoever on the part of either party, mutually agree to hold one another completely free and harmless from any loss or damage to one another's business or property, if said loss or damage is, would be, or could be, totally or partially covered by any type of real or personal property insurance and/or time element coverage (business interruption, profits and commissions, leasehold or rent) payable to either party as an insured, and both parties further agree to waive any and all rights of subrogation or recovery against one another that would inure to the benefit of their respective property insurance carrier(s).
XXIV.

Louisiana law permits "riverboat" gaming on certain navigable waters. La. R.S. 27:65. The Owner had a valid Louisiana gaming license to operate the Belle of Orleans as a riverboat casino and gaming establishment. At the time the parties entered into the Agreement in 1995, the law required riverboat casinos, including the Belle of Orleans, to be cruising navigable waters when engaged in gaming operations. In 2001, the Louisiana legislature abolished the cruising requirements and stated that gaming could only occur when a riverboat was dockside. La. R.S. 27:65(B)(1)(b). In compliance with the law, the Belle of Orleans conducted gaming cruises on Lake Pontchartrain from 1995 to 2001 and conducted all gaming dockside from 2001 until the occurrence of Hurricane Katrina in 2005.

The Belle of Orleans was subject to Coast Guard certification and inspection.[7] In 2001, the Owner sent a letter to the Coast Guard indicating that the Belle of Orleans would no longer be conducting cruises and would be remaining

> Lessee assumes full responsibility for all operation of the riverboat, including being aware of all weather conditions.
> XXV.
> Lessee recognizes that the premises are outside of flood protection and is [sic] exposed to high tides and hazardous weather which may prevail from time to time in Lake Pontchartrain. Lessor assumes no responsibility for damages or other consequences that may result from natural hazards and/or the lack of flood protection.

[7]In order to be eligible for Coast Guard documentation, the Belle of Orleans must be a "vessel," defined by 46 C.F.R. § 67.3 as "every description of watercraft or other contrivance capable of being used as a means of transportation on water, but does not include aircraft."

dockside at all times. The Coast Guard reduced the Belle of Orleans' manning requirements based upon her owner's "stated intent to operate in a continuously moored status." The Coast Guard limited the Belle of Orleans to "permanently moored operations" but did not prohibit the Belle of Orleans from navigating in the future. The Coast Guard's letter stated that "should the vessel return to underway passenger service, [it would] be required to show compliance with all applicable regulations for operation on a specific route intended and comply with standard manning requirements." The Belle of Orleans maintained a captain and a crew abroad and maintained her engines, generators, and equipment in working order at all times prior to the landfall of Hurricane Katrina in 2005.

When the Belle of Orleans began operating dockside in 2001, her owners added steel cables to her mooring system and attached electrical, computer, and phone cables from a shore-side source. The Belle of Orleans began receiving water in bulk from a shore-side source and began pumping her sewage to shore. The affidavit of the Belle of Orleans' chief engineer, Mr. Franklin, characterized the Belle of Orleans at this time as "permanently moored" and "out of operation." By contrast, the affidavit of Mr. Maureau, the Harbormaster of the Marina, characterized the Belle of Orleans as "moored with ropes and cables customary to

a fully operational vessel of her size, and . . . not permanently affixed to the dock or restricted in any way from being capable of navigation."

On August 29, 2005, Hurricane Katrina made its landfall in New Orleans, Louisiana. South Shore Harbor is located below the Industrial Canal in New Orleans East in an area that was heavily flooded and damaged during Katrina. During the hurricane, the Belle of Orleans broke loose from her moorings, and the Board claims she caused damage to the Marina dock and facilities. The Belle of Orleans also sustained serious damages herself, rendering her incapable of continuing operations without significant repairs. There were no repair facilities available in New Orleans to do the work. The closest shipyard with the necessary capabilities was Bender Shipyard in Mobile, Alabama. On December 30, 2005, the Owner engaged two tugboats to tow the Belle of Orleans from Southshore Harbor to Bender Shipyard. As a result of Katrina, the Owner also stopped paying rent to the Board. The Belle of Orleans remains in Mobile. When her repairs are complete, the Owner plans to tow the Belle of Orleans back to Amelia, Louisiana and continue to use her as a dockside riverboat casino.

## B.    Procedural History

On January 13, 2006, the Board instituted an action in the Southern District of Alabama against the Belle of Orleans, *in rem*, to enforce a maritime lien.[8] Count One sought payment of dockage, wharfage, utilities and other charges incurred by the Owner pursuant to the Agreement between the parties, and Count Two sought damages caused when the Belle of Orleans collided with structures at the Marina during Hurricane Katrina's landfall.  Pursuant to an order of arrest, a United States Marshal arrested the Belle of Orleans on January 23, 2006.  Belle of Orleans, L.L.C., filed a claim as the Belle of Orleans' owner on January 30, 2006, and requested a post-arrest hearing under supplemental admiralty rule E(4)(f) in order to have the court fix the amount of security necessary to gain release of the Belle of Orleans.  The court held a hearing on February 7, 2006, by telephone and entered an order temporarily setting security in the amount of $1.3 million to ensure that the Owner did not default on its ship mortgage.  The Marshal received a writ of discharge for the release of the Belle of Orleans the same day.

---

[8]The Board also filed an *in personam* suit against Belle of Orleans, L.L.C., in the Civil District Court for the Parish of Orleans on January 11, 2006.  That suit is based on state law and seeks to recover past due rent and to enforce the Board's "Lessor's Privilege" through a Louisiana state law writ of sequestration.  The complaint was later amended to add a claim for damage caused when the Belle of Orleans broke her moorings.  That litigation is pending in New Orleans, where the defendant has appeared, answered, and counterclaimed.

The Board filed an amended complaint on March 23, 2006, which included *in rem* claims against the Belle of Orleans and *in personam* claims against the Owner, and sought a writ of foreign attachment pursuant to Admiralty Supplemental Rule B against property of Belle of Orleans, L.L.C., located in the district, including the Belle of Orleans. The amended complaint demanded (1) $1,603,945.00 in unpaid fees incurred pursuant to the Agreement; (2) $20,608,236.00 in unpaid rent under the Agreement; and (3) $1,550,000.00 in damages caused when the Belle of Orleans collided with structures at the Marina as a result of the Owner's negligence and mismanagement in its mooring and $175,000 in consequential damages. On the same day, Belle of Orleans filed an answer to the Board's original complaint and asserted a counterclaim, and the magistrate judge conducted a follow-up post-arrest hearing. In its memorandum regarding the post-arrest hearing, Belle of Orleans, L.L.C., as owner of the Belle of Orleans, disputed the merits of the Board's claim, disputed the existence of a maritime lien and admiralty jurisdiction, and requested that the court either reduce or return the $1.3 million security.

In April 2006, at the request of the court, both parties briefed the issue of whether the Belle of Orleans was a "vessel" for purposes of determining admiralty jurisdiction. The following month, the parties consented to have a magistrate

judge preside over all proceedings, and he issued an order on May 25, dismissing the Board's complaint for lack of admiralty jurisdiction and holding that the Board's motion for Rule B attachment should not issue.  In June, the Board filed its 59(e) motion to vacate the May order, and the court denied it.  The Board filed its notice of appeal on June 26, 2006.

## II.    Discussion

We review the district court's order dismissing the case for lack of admiralty jurisdiction *de novo*.  *Wilkins v. Comm'l Inv. Trust Corp.*, 153 F.3d 1273, 1276 (11th  Cir. 1998).  Article III, Section 2, of the United States Constitution states that the judicial power of the United States shall extend "to all cases of admiralty and maritime jurisdiction."  U.S. Const. art. III, § 2, cl. 2.  Pursuant to that grant of jurisdiction, Congress vested district courts with original and exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."  *Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 348 (11th Cir. 1994) (quoting 28 U.S.C. § 1333(1)).  The Supreme Court and this Circuit have adopted an "expansive view" of admiralty jurisdiction to provide for the uniform application of general maritime law.  *See Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 901-02 (11th Cir. 2004) (The "Supreme Court has recently taken an

11

expansive view of admiralty jurisdiction and stated that in modern maritime commerce 'the shore is now an artificial place to draw a line.'"). Here, we must determine whether the district court properly dismissed the Board's *in personam* tort claims and its *in rem* contract claims for lack of admiralty jurisdiction and whether the district court was correct in failing to order attachment of the Belle of Orleans pursuant to Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims ("the Supplemental Rules").

## A.     The Definition of a "Vessel"

The Belle of Orleans' status as a "vessel" is crucial to establishing admiralty jurisdiction over both of the Board's claims, so we will address this issue first.[9] Our determination of whether the Belle of Orleans is a "vessel" is guided by the Supreme Court's decision in *Stewart v. Dutra Const. Co.*, 543 U.S. 481 (2005), and the Fifth Circuit's decision in *Pleason v. Gulfport Shipbuilding Corp.*, 221

---

[9]The district court made clear that it based its decision to deny admiralty jurisdiction largely on its determination that the Belle of Orleans was not a vessel. The district court stated that if the Belle of Orleans is not a vessel, "the Court's preliminary decision to grant the writ of seizure and have the [Belle of Orleans] arrested" would be incorrect. *Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 439 F. Supp. 2d 1178, 1192 (S.D. Ala. 2006). The court also stated that "non-vessel status would take away any and all maritime flavor from the lease agreements sued upon" and "thereby establish that this Court lacks admiralty jurisdiction in this matter." *Id.* "Plaintiff's tort claim asserted against the defendants must, as well, be dismissed based upon the [Belle of Orleans'] non-vessel status inasmuch as it is well established that a tort must be committed 'by a vessel' on navigable waters." *Id.* at 1200.

F.2d 621 (5th Cir. 1955), which addressed precisely the legal issue we face in the instant case.[10]

In *Pleason*, the court addressed whether the Carol Ann, a Navy salvage and repair vessel which had been converted into a shrimp-processing plant, was a "vessel" subject to a maritime lien under 46 U.S.C. § 971.[11]  221 F.2d at 623.

In 1951, the Carol Ann was "grounded in shallow water [near Belize] and her shaft alleys and engine room were flooded." *Id.* at 622.  She was floated and towed to Texas where the lien claimant furnished the materials and performed the services necessary to fully convert the Carol Ann into a shrimp-processing plant. *Id.*  At the time of the repairs, the Carol Ann was in the following condition:

> [H]er propellers and propeller shafts had been removed; she had no crew; none of her machinery was in operation; she had no light, heat, or power in operation; her main engines had been completely removed; and her steering apparatus, with the exception of the rudder, had been removed and sold; her superstructure and masts were intact; her navigation lights were in place, though not operable; her compartmentation, including cargo holds, was intact; and she contained in her crew quarters and elsewhere some articles of furnishing, including bunks, tables, chairs and stoves.

---

[10]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[11]46 U.S.C. § 971 is now codified at 46 U.S.C. § 31342, which states that those providing necessaries to a vessel are entitled to a maritime lien against that vessel enforceable *in rem*.

*Id.* at 622-23.  Following her repairs, the Carol Ann was towed across the Gulf of Mexico, without crew, motive power, or operative steering device; was moored to a dock by steel cables and ropes; received telephone and electric lines from land; and was used to receive "shrimp from trawlers for processing, freezing, storing and resale in commerce, in the same manner as a similar plant would operate on land."  *Id.* at 623.  The court emphasized the phrase "capable of being used" within the definition of vessel in 1 U.S.C. § 3, and held:

> The "Carol Ann" was an artificial contrivance capable of being used as a means of water transportation.  It was afloat.  . . . [I]t was towed.  . . .  It had a deck; it had cabins, it had superstructure.  It had no motive power of its own; no steering mechanism; but it definitely was capable of being used as a means of transportation under tow.  . . . [I]t is plain to us that the "Carol Ann" was a "vessel" subject to a maritime lien, enforceable by suit in rem.

*Id.*

Here, the Belle of Orleans, too, was moored to the dock with steel cables, received utility lines from land, and engaged in a business that could have physically, if not legally, been conducted on shore; yet, under the reasoning of *Pleason*, this made her no less a vessel.  Like the Carol Ann, the Belle of Orleans was certainly afloat; she was towed across the Gulf of Mexico for purposes of repair; and she had a deck, cabins, and superstructure.  Further, unlike the Carol Ann, the Belle of Orleans was capable of being used as a means of transportation

14

*without the assistance of tow*, operated with a captain and a crew aboard, and had maintained her engines, generators, and equipment in working order at all times prior to Hurricane Katrina. Thus, if we are to be bound by *Pleason,* the Belle of Orleans is a "vessel" subject to maritime lien.

The district court and the Belle of Orleans fail to cite *Pleason* and rely heavily on a line of Fifth Circuit cases beginning with *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995). *Pavone* arose when two employees, stationed on a moored, dockside casino in Biloxi, Mississippi, known as the Biloxi Belle filed suit under the Jones Act, 46 U.S.C. App. § 688, to recover for injuries they received while at work.[12] 52 F.3d at 562-63. The court's Jones Act analysis required it to determine whether the Biloxi Belle was a vessel.

The Biloxi Belle was constructed as a barge with a "steel hull, a raked bow to facilitate its being towed, bilge pumps, functional ballast tanks, an auxiliary generator to supply emergency electrical power, and below-deck features including storage facilities and a galley for employee meals and work breaks." *Id.* at 564. The Biloxi Belle was Coast Guard certified, yet she "ha[d] no engine, no

---

[12]"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply." 46 U.S.C. App. § 688(a).

captain, no navigational aids, no crewquarters and no lifesaving equipment." *Id.*

at 564-65. Her pilot house, antique wheel, ring buoys, and nonfunctional

paddlewheel were purely for visual effect and to allow her to be certified under

Louisiana's gaming laws. *Id.*

> [T]he Biloxi Belle was moored to shore by lines tied to sunken steel
> pylons that were filled with concrete. The first level of the Biloxi
> Belle was connected to the pier by steel ramps, and the second level
> was joined to a shore-side building. In addition, numerous shore-side
> utility lines – telephone, electric, gas, sewer, domestic fire and water,
> cable TV, and computer – were connected permanently (or at least
> indefinitely) to the Biloxi Belle. Only by removing steel pins from
> the ramps and letting loose all lines and cables could the Biloxi Belle
> be disconnected from the shore.

*Id.* The Fifth Circuit assumed *"arguendo* that [the Biloxi Belle] was built and

used for nonvessel purposes, was moored other than temporarily to the bank, and

either had been 'withdrawn from navigation' or was being used as a 'work

platform,' or both." *Id.* at 568.

The Fifth Circuit applied its existing Jones Act precedent with regard to

crafts no longer "in navigation" or serving as "work platforms" and focused on the

"purpose for which the craft [was] constructed and the business in which it is

engaged." *Id.* at 570. Using this precedent the court held:

> When the undisputed facts of the instant cases are plugged into (1)
> the *Desper/Hawn* withdrawn-from-navigation factors, or (2) the
> *Bernard/Gremillion* work-platform attributes, or both, and are

16

compared to the functional and nautical characteristics and mooring statuses of the various craft that in earlier cases were held as a matter of law to be nonvessels for Jones Act purposes, there can be little doubt that indefinitely moored, shore-side, floating casinos, such as the Biloxi Belle, must be added to that list.

*Id.* at 570.[13]  Despite the arguments of the Board and the district court, we find *Pavone* to be factually and legally distinguishable from the instant case.[14]

Legally, *Pavone* arose under the Jones Act rather than under a maritime contract giving rise to a maritime lien.  *See Stewart*, 543 U.S. at 496 (noting that courts have historically tended to more narrowly construe the definition of a vessel in Jones Act cases); *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919,

---

[13] *Desper v. Starved Rock Ferry Co.*, 342 U.S. 187 (1952), quoted from *Hawn v. Am. S.S. Co.*, 107 F.2d 999, 1000 (2d Cir. 1939), and discussed the concepts "withdrawn from navigation" and "work platform" and how they help to distinguish "craft or structures that meet the general dictionary definition of 'vessel' from those that meet Jones Act or the general maritime law vessel status at a given time." *Pavone*, 52 F.3d at 569.  *Bernard v. Binnings Constr. Co.*, 741 F.2d 824 (5th Cir. 1984), sets out a three-part test to address work platform cases.  *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290 (5th Cir. 1990), elaborates on the test in *Bernard*.  *Id.* at 569-70.

[14] The other cases cited by the Belle of Orleans are equally unpersuasive because they rely on *Pavone* or involve factually dissimilar watercraft.  *See Martin v. Boyd Gaming Corp.*, 374 F.3d 375, 377 (5th Cir. 2004) (relying on *Pavone* and not examining the casino's practical navigability); *Dunklin v. Lousiana Riverboat Gaming P'ship*, 260 F.3d 621 (5th Cir. 2001) (per curiam) (same); *Hertz v. Treasure Chest Casino, L.L.C.*, 274 F. Supp. 2d 795, 800 (E.D. La. 2003) (same); *Davis v. Players Lake Charles Riverboat, Inc.*, 74 F. Supp. 2d 675, 676 (W.D. La. 1999) (same); *D Canale Food Servs., Inc. v. Splash Casino & Resort, Inc.*, No. 2:95CV70-B-A, 1995 WL 1945520 (N.D. Miss. Oct. 27, 1995) (involving a structure that had no means of propulsion, rudders, life saving equipment, crew quarters, generators or navigational equipment); *King v. President Riverboat Casino-Mississippi, Inc.*, 894 F. Supp. 1008, 1011 (S.D. Miss. 1995) (not looking at practical navigability); *In re Biloxi Casino Belle, Inc.*, 176 B.R. 427, 431 (Bankr. S.D. Miss. 1995) (involving a structure that had no means of propulsion or steering and that was not located on a navigable water way).

925 n.7 (11th Cir. 2001) ("[A]t least twenty-four maritime cases or maritime related statutes suggest slightly different wordings for the definition of vessel. We refuse to adopt the definition of vessel that Freeport urges, as it is based on unrelated statutes."). Further, the court assumed *arguendo* in applying its Jones Act analysis that the Biloxi Belle "was built and used for nonvessel purposes." *Pavone*, 52 F.3d at 568. While this assumption might have been appropriate for the Biloxi Belle, it is not for the Belle of Orleans, which was built as a passenger vessel and cruised on Lake Pontchartrain from 1995 through 2001. Factually, the Biloxi Belle was a much different watercraft than the Belle of Orleans in question. The Belle of Orleans' pilot house, antique wheel, ring buoys, and paddlewheel were functioning rather than purely for visual effect. She could operate under her own power rather than purely by tow; she maintained an engine, a steering mechanism, and a captain; and further, she maintained a reduced maritime crew rather than a mere casino staff.

We are bound to follow the panel's decision in *Pleason*, as it addresses the same issue of law, unless it has been overruled by this court sitting *en banc* or by the Supreme Court of the United States.[15] We may only decline to follow *Pleason*

---

[15]No court has ever expressly overruled *Pleason*, and the Fifth Circuit continued to explicitly cite it until the time of the circuit split in 1981. *See Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht*, 625 F.2d 44, 47 (5th Cir. 1980) (holding that a yacht that was test sailed

if such action is necessary to give full effect to the rationale of an intervening decision of the Supreme Court. *Lufkin v. McCallum*, 956 F.2d 1104, 1107-08 (11th Cir. 1992). Both parties contend that the Supreme Court's recent decision in *Stewart v. Dutra Constr. Co.*, 543 U.S. 481 (2005), is relevant to this matter. The Board contends that *Stewart* endorses the analysis in *Pleason*, while the Belle of Orleans contends and the district court agreed that *Stewart* embraces the holding in *Pavone*. *See Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 439 F. Supp. 2d at 1193 ("far from overruling *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995) and its progeny, *Stewart* [543 U.S. at 494] embraced *Pavone*, and its semi-permanently floating casino, as a clear and indisputable example of a non-vessel, that is, a watercraft not capable of being used for maritime transport in any meaningful manner."); Appellant's Brief at 25 ("In reaching its conclusion, the *Pleason* court engaged in the analysis dictated forty years later [by] the United States Supreme Court in *Stewart* – whether the craft was capable of being used as a means of transportation on water.").

---

was a vessel even though it was later placed in dry storage); *M/V Marifax v. McCrory*, 391 F.2d 909, 910 (5th Cir. 1968) (per curiam) ("Even fifteen years of resting inertia does not necessarily destroy navigability."); *Miami River Boat Yard, Inc. v. 60' Houseboat*, 390 F.2d 596, 597 (5th Cir. 1968) (holding that a houseboat which has "no motive power and must, as would the most lowly of dumb barges, be towed" is not deprived of her status as a vessel).

*Stewart* addressed "whether a dredge [was] a 'vessel' under § 2(3)(G) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (Pt. 2) 1425, as added by § 2(a) of Pub. L. 98-426, 33 U.S.C. § 902(3)(G))." 543 U.S. at 484. *Stewart's* core holdings were that (1) 1 U.S.C. § 3 is a codification of the general maritime law and provides the definition of "vessel" throughout the United States Code; and (2) "[u]nder § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Id.* at 490, 497. The Supreme Court made clear that the focus of the "vessel" inquiry is the craft's capability, not its present use or station; "[a] ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id.* at 496.

We are unpersuaded by the district court's argument that *Stewart* dictates that we must follow the court in *Pavone* and hold that all moored casinos are not *vessels*. The Supreme Court stated:

> Simply put, a watercraft is not "capable of being used" for maritime transport in any meaningful sense if it has been permanently moored

20

> or otherwise rendered practically incapable of transportation or movement.
>
> This distinction is sensible: A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again. *See Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 570 (5th Cir. 1995) (floating casino was no longer a vessel where it "was moored to the shore in a semi-permanent or indefinite manner"); *Kathriner v. UNISEA, Inc.*, 975 F.2d 657, 660 (9th Cir. 1992) (floating processing plant was no longer a vessel where a "large opening [had been] cut into her hull," rendering her incapable of moving over the water). Even if the general maritime law had not informed the meaning of § 3, its definition would not sweep within its reach an array of fixed structures not commonly thought of as capable of being used for water transport.

*Stewart*, 543 U.S. at 494. This citation must be read in context with the facts of *Pavone*, which characterize the Biloxi Belle, a watercraft which has never sailed without tow and which is unable to do so, as a "work platform" that has been "removed from navigation" and was built for "nonvessel purposes." In this context, the Supreme Court's citation of *Pavone* does nothing to bind us to *Pavone's* holding; rather, the Supreme Court simply cites *Pavone* for the principle that a craft can remain out of navigation long enough that it loses its vessel status. *See id.* at 493-94 (There is a "distinction drawn by general maritime law between water craft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor.").

21

Further, we believe that *Stewart* supports the analysis we applied in *Pleason*. Both decisions use the definition of "vessel" found in 1 U.S.C. § 3 and direct their focus to whether a watercraft is practically capable of serving as a means of transportation upon water rather than her owner's intended use or her actual mobility at the time in question. However, the parenthetical the Supreme Court inserted after *Pavone*, "floating casino was no longer a vessel where it 'was moored to the shore in a semi-permanent or indefinite manner,'" leaves it unclear as to how long a craft must be moored to lose its vessel status. *Stewart*, 543 U.S. at 494. In *Pleason,* the vessel had been moored for only a number of months when the relevant claims took place, and she continued to be moored for the majority of the four years while the litigation was pending. Here, the Belle of Orleans had been moored for four years when the claims occurred, and she is destined to be moored again following her repairs.

Both the Fifth and the Seventh Circuits have addressed the meaning of "permanently moored or otherwise rendered practically incapable of transportation or movement" post-*Stewart*. In *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185 (5th Cir. 2006), the Fifth Circuit endorsed *Pavone's* holding and stated that "[e]ven after *Stewart*, an indefinitely moored floating casino like the Crown Casino is not a 'vessel' for purposes of admiralty jurisdiction." *Id.* at 188 (The

22

Crown Casino had cruised until 2001 when Louisiana changed its gaming laws and has been moored ever since.). The court focused on Louisiana gaming law and the owner's intention to continue operating as a casino and held that "although the Crown Casino was still physically capable of sailing, such a use was merely theoretical." *Id.* at 187.

The Seventh Circuit addressed the issue in *Tagliere v. Harrah's Ill. Corp.*, 445 F.3d 1012 (7th Cir. 2006). The court stated, "there has been no showing that the boat in our case, though stationary for the past two years, is *permanently* moored in the Court's sense (disabled from sailing) and is thus the equivalent of landfill"; therefore, the district court cannot dismiss the case for lack of jurisdiction unless the parties can show that the boat was permanently, not indefinitely, moored. *Id*. at 1014 (emphasis in original). The Seventh Circuit analogizes to the difference between domicile and residence and suggests without holding that a boat may be "permanently" moored "when its owner intends that the boat will never again sail," while it might be "indefinitely" moored "if he has not yet decided its ultimate destiny." *Id.* at 1016.

Under the language of *Stewart*, however, we find that neither court articulates an appropriate test. Both focus on the intent of the shipowner rather than whether the boat has been "rendered practically incapable of transportation or

23

movement." 543 U.S. at 494. The owner's intentions with regard to a boat are analogous to the boat's "purpose,"[16] and *Stewart* clearly rejected any definition of "vessel" that relies on such a purpose. *See id*. at 497 ("Under § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose . . . ."). Further, such a test is incompatible with the Supreme Court's focus on providing uniformity within admiralty jurisdiction. *Celebrity Cruises, Inc.*, 394 F.3d at 902 ("[T]he purpose behind the exercise of this Court's admiralty jurisdiction is to provide for the uniform application of general maritime law.").

Under *Tagliere* and *De La Rosa*, a boat may enter and leave admiralty jurisdiction on the basis of state law and the individual thoughts of the boat owner as to what use of the boat is most desirable. As the Louisiana legislature demonstrated by its actions in 2001, state law can change. Further, if legal navigability is the test for vessel status, any ship with an expired Coast Guard certification becomes a non-vessel, and those working upon it and around it lose their protection under the Jones Act or the LHWCA. Such a result is clearly not what the Supreme Court intended. *See Stewart*, 543 U.S. at 494 (noting that

---

[16]Dictionaries have defined "to intend" as "[t]o have in mind a fixed purpose to reach a desired objective; to have as one's purpose, *Black's Law Dictionary* 825 (8th ed. 2004), "purpose" as "[t]hat which is intended" or "[a]n intention," *Ballentine's Law Dictionary*, Lexis Law Publishing (1969).

24

seamen do not lose their protection under the Jones Act due to minor changes in ship location). Also, an owner's intentions may change in ways never anticipated. We need look no further than the Star of India for an example. In 1973, the Southern District of California rejected the Coast Guard's designation of the Star of India as permanently moored and her owner's statement that he did not intend to sail her again, and declared her subject to admiralty jurisdiction. *Luna v. Star of India*, 356 F. Supp. 59, 66 (S.D. Cal. 1973) ("The fact that the Star currently rests at dockside detracts not at all from her colorful past nor her future capacities."). A mere three years later, the Star of India was put to sea for the first time in fifty years, and she continues to sail annually.[17]

With this in mind, we will place our primary focus, as *Stewart* directs, on whether the Belle of Orleans was "rendered practically incapable of transportation or movement" when her owner moored her in 2001. As our analysis under *Pleason* above states, the Belle of Orleans maintained functioning machinery and was capable of moving under her own power. The district court made minimal

---

[17]*See* http://www.sdmaritime.com/ContentPage.asp?ContentID=197 ("In 1976, with her restoration complete, the sailing ship Star of India sailed on San Diego bay for the first time in 50 years. The sailing ship Star of India is now the pride of the Maritime Museum of San Diego's fleet of historic ships. She is maintained by a dedicated group of volunteers and skilled craftsmen and sailed at least once a year.").

factual findings, but it appears that all her crew would have had to do was unmoor her cables and start up her engine and the Belle of Orleans would have been able to sail. Further, as she illustrated most recently in 2005, the Belle of Orleans was capable of moving over water, albeit to her detriment, and was capable of being transported under tow. As such, we hold that the Belle of Orleans is a "vessel" for purposes of admiralty jurisdiction.

## B. The Board's *In Personam* Tort Claims

The district court dismissed the Board's tort claims for lack of admiralty jurisdiction having determined that they were not committed "by a vessel on navigable waters." *Bd. of Comm'rs v. M/V Belle of Orleans*, 439 F. Supp. 2d 1178, 1200 (S.D. Ala. 2006). We reverse.

"[A] party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 900 (11th Cir. 2004) (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)).

> To satisfy the location test, the tort must have occurred on navigable water or the injury suffered on land must have been caused by a vessel on navigable water. With respect to the connection test, two issues must be considered: (1) whether, upon assessment of the general features of the type of accident involved, the "incident has a

26

potentially disruptive impact on maritime commerce;" and (2) "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."

*Broughton v. Fla. Int'l Underwriters, Inc.*, 139 F.3d 861, 865 (11th Cir. 1998) (internal citations omitted).

We applied these conditions in *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919 (11th Cir. 2001), which involved circumstances similar to the case at issue. In *Bunge*, a water-bound casino, in her final stages of construction, broke free from her moorings on the east side of Four Mile Creek during Hurricane Opal and struck and damaged a grain-loading conveyor facility located on the west side of Four Mile Creek. *Id.* at 922. We held that (1) the tort occurred on "navigable waters" and met the locality test; (2) a partially-constructed vessel which broke free and damaged property alongside a waterway had the potential to and actually did disturb commercial activity; and (3) a collision which occurred on navigable waters due to the imperfect mooring of a nearly complete vessel bore a substantial relationship to traditional maritime activity.

Here, the tort committed by the functioning Belle of Orleans is analogous to the tort committed by the partially-constructed casino in *Bunge* and clearly satisfies the conditions laid out in *Celebrity Cruises, Inc.*, and *Broughton*. The

27

Belle of Orleans was a vessel; she was operating in South Shore Harbor, a navigable waterway; she broke free from imperfect moorings; she had the potential to and actually did disturb commercial activity; and she is alleged to have caused damage when she struck property alongside a navigable waterway. Thus, the district court improperly concluded that there was no admiralty jurisdiction over the Board's tort claim.

Having found there was no admiralty jurisdiction over the Board's tort claim, the district court then improperly refused to issue a writ of attachment under Rule B of the Supplemental Rules. A plaintiff asserting an *in personam* maritime claim may seek an attachment of the relevant vessel under Rule B if he produces an affidavit attesting to the fact that the defendant cannot be "found within the district" for purposes of jurisdiction and service of process. *See* Rule B(1)(b); *Nehring*, 901 F.2d at 1051 n.6. After a review of the complaint and the affidavit, the court must enter an order authorizing the process of attachment and garnishment if the conditions of Rule B exist. Rule B(1)(b). As explained above, the Board has properly stated a maritime tort claim for the damage caused by the Belle of Orleans when she broke free of her moorings and struck the Marina. The parties agree that Belle of Orleans, L.L.C., cannot be found in the Southern District of Alabama. Thus, the necessary conditions exist and the district court

should have accepted admiralty jurisdiction and ordered the attachment of the Belle of Orleans pursuant to Rule B.

### C.    The Board's *In Rem* Contract Claims

Having determined that the Belle of Orleans was not a vessel, the district court dismissed the Plaintiff's *in rem* claims and held:

> [T]he subject matter of the lease agreements sued upon is simply not maritime inasmuch as it has no reference to maritime services or transactions, does not relate to a "ship/vessel" in its use as such, does not relate to commerce or navigation on navigable waters or to transportation by sea, and is not necessary to the operation, navigation or management of a "ship/vessel."

*Bd. of Comm'rs*, 439 F. Supp. 2d at 1198. The district court went on to state that even if the Belle of Orleans were a vessel, "a contract providing for lease payments for acres or real property/land, which includes a marina and river bottom adjacent to the marina, is not a maritime contract" because it does not "facilitate the putative vessel's use in navigation or maritime commerce." *Id.* at 1200. While we disagree with the district court's analysis, we affirm its dismissal.

"An *in rem* suit against a vessel is . . . distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts." *Am. Dredging Co. v. Miller*, 510 U.S. 443, 446-47 (1994). A plaintiff may bring an action *in rem* to enforce a maritime lien. *See Bradford Marine*, 64 F.3d at 589 ("The lien and

the proceeding *in rem* are, therefore, correlative – where one exists, the other can be taken, and not otherwise.") (quotation and citation omitted). A maritime lien may arise out of the breach of a maritime contract, but "[n]ot every contract that somehow relates to a ship or its business is considered maritime." *Nehring v. Steamship M/V Point Vail*, 901 F.2d 1044, 1048 (11th Cir. 1990). *See Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1 (1920) ("A contract cannot afford the necessary basis for a maritime lien, unless it is maritime in its nature, so as to be cognizable in admiralty.")).

A maritime contract must "pertain directly to and be necessary for commerce or navigation upon navigable waters." *Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998). This definition of a maritime contract is inexact and difficult to apply. As such, courts look to precedent and usage with regard to more common types of contracts and consider less common situations on a case-by-case basis. *Nehring*, 901 F.2d at 1048.

A contract that provides a vessel with "necessaries" is commonly considered a maritime contract giving rise to a maritime lien. *See* 46 U.S.C. §§ 31341-342. The term "necessaries includes repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). Courts have also commonly interpreted "necessaries" to include "wharfage" or "dockage," the

30

charge to which vessels are liable for the use of a dock or wharf. *Inbesa*, 134 F.3d at 1037-38. "Necessaries" has further been liberally construed to include:

> "what is reasonably needed in the ship's business," such as "goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged."

*Bradford Marine,* 64 F.3d at 589 (citations omitted) (holding that legal services provided to claimant in pursuing its *in rem* action were not "necessaries" because they were not provided to the vessel itself). *See also Inbesa*, 134 F.3d at 1036 ("The test we apply in deciding whether the subject matter of a contract is necessary to the operation, navigation, or management of a ship is a test of reasonableness, not of absolute necessity."). Services may be "important," yet still not be "necessary." *See id.* at 1037 (holding that although cargo services were "no doubt important" to the business they were not "necessary" because they "took place on land without regard to whether the [ship] was in port" and could have taken place before it arrived or after it left). Husbandry contracts for "landside marine support services such as cargo solicitation, procurement of supplies, crews, stevedores or tugs, are not cognizable in admiralty since these services are considered to be of a nature preliminary to the voyage." *Nehring,* 901 F.2d at

1049 (citing *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293 (2d Cir. 1987)).

In deciding to dismiss Plaintiff's action, the district court relied heavily on the fact that the Agreement did not specifically mention wharfage or dockage. The absence of the terms "wharfage" or "dockage" does not *per se* render the Agreement non-maritime. The Agreement specifically provided that Parcel 1 was for "[t]he proposed mooring berth for the riverboat casino and the right of exclusive use of the adjacent wharf area." Parcel 1 was necessary to load passengers, employees, and materials onto the Belle of Orleans. Further, at the time the contract was signed in 1993, the Belle of Orleans was engaged in casino cruises and was using Parcel 1 as her wharf between cruises. At that time Parcel 1 pertained directly to and was necessary for the Belle of Orleans' "commerce and navigation upon navigable waters." The Belle of Orleans could not cruise Lake Pontchartrain without a wharf to come back to between journeys to resupply, and she could not conduct her "particular function," casino commerce, without a wharf from which her passengers could enter and leave the ship. The fact that the Belle of Orleans' owners chose to lease a parcel, including a wharf for the purpose of a

32

mooring berth for a specific vessel, rather than pay for wharfage each time they used the dock is simply not outcome determinative.[18]

The Belle of Orleans argued that the Agreement for Parcel 1 was not a maritime contract because it merely provided for the lease of land. The Board provided no services to the Belle of Orleans, and the Owner was responsible for all casino operations, including loading and unloading passengers and goods. The Agreement was unlike the maritime contract, referenced by the Board, in *Kaleidoscope Tours v. M/V Tropicana*, 755 F. Supp. 382 (S.D. 1990), which arranged for embarkation services for a cruise ship, including the collection of fares and tickets and the checking of passports. One could argue, therefore, that the lease of Parcel 1 was not a maritime contract because it was "not tied to services to a specific vessel." *See Royal Ins. Co. Of Am. v. Pier 39 Ltd. P'ship*, 738 F.2d 1035 (9th Cir. 1984) (distinguishing *Ex parte Easton*, 95 U.S. 68 (1877) (holding that an agreement to pay for use of a berth over eleven days was a maritime contract), and stating, "If there is no connection to a specific vessel, however, contracts relating to wharves generally are not within admiralty jurisdiction. A contract to lease a wharf, for example, is not within the

---

[18]In 1993 when it signed the Agreement, the Owners were well aware that they would be docking the Belle of Orleans at the Marina multiple times a day. It is a logical economic proposition that they would rent the wharf rather than paying wharfage each time they used it.

jurisdiction if the lease is not tied to services to a specific vessel."). We reject this argument. There is no case law in this circuit to support it, and we find that there is nothing more essential to "commerce and navigation upon navigable waters" than that a vessel have a port from which to depart and for which to return. Further, this lease serves a specific vessel and expressly provides its purpose is for the proposed mooring berth for that vessel. Thus, under the factual circumstances of this case, the Agreement for Parcel 1 was analogous to "wharfage" and was maritime in nature.

However, Parcel 1 made up only a small percentage of the total land leased under the Agreement, less than five percent. A contract must be "wholly maritime in nature" to fall within federal admiralty jurisdiction or "its non-maritime elements must be either insignificant or separable without prejudice to either party." *Inbesa,* 134 F.3d at 1036. Parcels 2, 3, 4, and 5 are not "necessaries," and we agree with the district court that the contract to procure them has no "maritime flavor." These elements of the contract would be equally applicable to a casino functioning on land in a way that the lease of the river bottom in Parcel 1 would not. Belle of Orleans argues that even if these are not maritime, the contract as a whole may still be so. Such an argument is unpersuasive. These elements, which make up more than ninety-five percent of the total contract, are not "insignificant"

or easily severable. The Board would likely not have leased the wharf space to the Owner but for the agreement regarding the remainder of the property. Further, the contract price, which is based on a quarterly rental fee and a percentage of the gambling revenue, cannot be distilled into a per acre figure so that the portion of the contract dealing with Parcel 1 may be severed.[19] Even if the total cost could be converted into a per acre number, it is unclear whether each acre agreed upon has an equal value to the parties. Thus, although the Agreement regards a "vessel" and contains maritime elements, it is not a maritime contract giving rise to a maritime lien.

## III. Conclusion

Under the analyses and holdings of *Pleason* and *Stewart*, the Belle of Orleans is a "vessel," subject to admiralty jurisdiction. The Board properly pled a maritime tort claim resulting from the allision between the Belle of Orleans and the Marina during Hurricane Katrina under our precedent in *Bunge Corp*. and properly requested the attachment of the Belle of Orleans pursuant to Rule B. Therefore, the district court improperly dismissed the Board's *in personam* tort

---

[19] The original Agreement states in Section III that "the minimum rent per annum shall be $700,000 (based on $1.50 per sq. ft. for 10.71 acres more or less) . . . (R-1, Ex. 1, at III), however, this in no way indicates the value of the acreage in Parcel 1, whether these calculations are applicable after the Agreement's multiple amendments, or whether this number changed when a portion of the Belle of Orleans' gambling revenue was added as additional rent.

claim for lack of admiralty jurisdiction and should attach the Belle of Orleans pursuant to Rule B of the Supplemental Rules. However, the Board has not established a maritime contract claim giving rise to a maritime lien enforceable *in rem*. The Agreement, although partially maritime in nature, is not predominantly maritime and contains substantial non-maritime elements that cannot be severed without injury to the parties. The district court correctly dismissed the Board's *in rem* contract claims.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**