THIBODEAUX, Chief Judge,
dissenting.
These facts are undisputed. Crown was constructed as a completely functional riverboat. Prior to 2001, the period during which Louisiana laws prohibited dockside gambling, Crown with passengers regularly cruised the waters. When in 2001 the gaming laws changed to allow dockside gambling, Crown was moored on Calcasieu River, and it has remained moored ever since.
Crown is connected to an adjacent concrete wharf by nylon mooring lines and steel cables. Crown is also connected to land by utility lines that supply electricity, water, telephone, sewerage, cable television, and computer access. There is also a guest entrance walkway — a steel structure controlled by hydraulic ramps attached to the land-based pavilion. Despite all of the above-described attachments to land, Crown can be ready to sail on its own in less than one hour.
Crown has a captain and a marine crew who maintain the riverboat in proper operating order. All of the navigational tools and equipment as well as Crown’s engines *6 are constantly checked and maintained in proper working order. In short, Crown is a completely functional riverboat.
At the time of the incident, as was required by then-existing legislation, Crown held a certifícate of inspection issued by the United States Coast Guard (USCG). Crown floats on its own in the Calcasieu River. In fact, Crown can and, at times, does operate under its own power free from the shore-side systems for as long as eight hours.
Once or twice a week, the Crown’s captain activates and operates both the port and starboard main engines of the vessel. This is done to hold Crown against its dock because when large ocean-going ships dock at or leave from the adjacent shipyard, it creates a significant disturbance of the waters.
Admiralty Jurisdiction
Admiralty jurisdiction in tort cases is conferred by 28 U.S.C. § 1333(1). See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995); De La Rosa v. St. Charles Gaming Co., 474 F.3d 185 (5th Cir.2006). The party seeking admiralty jurisdiction “must satisfy conditions both of location and of connection with maritime activity.” Strong v. B.P. Exploration & Prod., Inc. 440 F.3d 665, 669 (5th Cir.2006) (citation omitted). There are two alternative ways to satisfy the location test: “the plaintiff must show that the tort ‘occurred on navigable water’ or that an ‘injury suffered on land was caused by a vessel on navigable water.’ ” De La Rosa, 474 F.3d at 187 (citation omitted). The connection test involves two additional inquiries: (a) whether the incident had the potential to disrupt maritime commerce; and, (b) whether the general character of the tortfeasor’s activity giving rise to the incident had a substantial relationship to traditional maritime activity. Jerome B. Grubart, Inc., 513 U.S. 527, 115 S.Ct. 1043; Quinn v. St. Charles Gaming Co., Inc., 01-794 (La.App. 3 Cir. 2/6/02), 815 So.2d 963, writ denied, 02-694 (La.4/12/02), 813 So.2d 412.
The first inquiry is whether Crown is a vessel.[1] The next inquiry is whether the location test can be satisfied by determining whether the tort occurred on a navigable waterway. Finally, it is necessary to examine whether the test of connection to traditional maritime activity has been satisfied.

(1) The Location Test

(a) Is Crown a Vessel?
There are two sources of law in Louisiana: legislation and custom, with legislation superseding custom in every instance. Doerr v. Mobil Oil Corp., 00-947 (La.12/19/00), 774 So.2d 119 (citing La.Civ. Code arts. 1, 3). “Judicial decisions, on the other hand, are not intended to be an authoritative source of law in Louisiana.” Id. at 128 (citing A.N. Yiannopoulos, Louisiana Civil Law System § 35 (1977)). Because “‘one of the fundamental rules of [the civil law tradition] is that a tribunal is never bound by the decisions which it formerly rendered: it can always change its mind,’ 1 Marcel Planiol, Treatise on the Civil Law § 123, (La. State Law Inst. trans.1959) (12th ed.1939), prior holdings *7 by this court are persuasive, not authoritative, expressions of the law.” Id. at 128-29 (citing A.N. Yiannopoulos, Louisiana Civil Law System § 35 (1977)). Thus, “a prior judicial (mis)construetion of a statute does not ‘insulate ’ the Louisiana judge ... from returning to the legislation itself to ascertain its correct meaning and application.” Albert Tate, Jr., Civilian Methodology in Louisiana, 44 Tul. L.Rev. 673, 678(1976).
As Justice Dennis explained, in Louisiana, legislation “is the primary source of law, and precedent serves merely as an example of a prior judge’s interpretation and application of legislated law.” James L. Dennis, Interpretation & Application of the Civil Code & the Evaluation of Judicial Precedent, 54 La. L.Rev. 1, 3 (1993). Thus, “[i]t should be evident that the common-law or case-law theory of precedent is incompatible in many ways with the legal method of deciding a case.... ” Id. at 14. Furthermore, the civil law method should be applied to determine “whether the case should be imitated in a subsequent decision.” Id. at 15. Therefore, “if a judge ignores a clearly applicable Code rule and follows another jurisdiction’s case, his example of using the wrong starting point or source of law should not be influential at all.” Id.
For the purposes of admiralty jurisdiction, “[t]he word ‘vessel’ includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.” 1 U.S.C. § 3. See also Stewart v. Dutra Constr. Co., 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). “A watercraft is not ‘capable of being used’ for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement.” Id., 543 U.S. at 494, 125 S.Ct. at 1127 (emphasis added). Even though 1 U.S.C. § 3 requires that the watercraft is capable of being used as a means of transportation on water, “[i]t does not require that a watercraft be used primarily for that purpose.” Stewart, 543 U.S. at 495, 125 S.Ct. at 1128 (citation omitted).
A ship does not move in and out of admiralty jui’isdiction depending on whether the ship is at an anchor, docked for loading or unloading, or berthed for minor repairs. Id. Similarly, ships that are taken permanently out of the water do not remain vessels because of the remote possibility that they may sail again in the future. Id.
The following cases provide some guidance as to whether something is or is not a vessel. A dredge, a massive floating platform that had a captain and a crew, navigational lights, ballast tanks, and a crew dining area, but lacked self-propulsion and was moved by a tugboat, was a vessel for maritime law purposes when it lay idle because one of its scows had suffered an engine malfunction and the other was at sea. Stewart, 543 U.S. 481, 125 S.Ct. 1118.
In De La Rosa, 474 F.3d 185, a case involving the same riverboat whose vessel status is disputed in our case, the court held that Crown was not a vessel. The Fifth Circuit reasoned that while Crown “was still physically capable of sailing, such a use was merely theoretical” because “Defendants do not intend to use it” as a sailing vessel and, instead, intend “to use it solely as an indefinitely moored floating casino.” Id. at 187 (emphasis added).
A riverboat casino that conducted gaming cruises on Lake Pontchartrain until 2001 and conducted all gambling dockside from 2001 until Hurricane Katrina in 2005, was held to be a vessel for the purposes of establishing admiralty jurisdiction. Bd. Of Comm’rs of Orleans Levee Dist. v. M/V Belle of Orleans, 535 F.3d 1299 (11th Cir. *8 2008). There, the vessel was subject to USCG certification and inspection. The riverboat had a captain and a crew, and they maintained the boat’s engines, generators, and equipment in working order at all times prior to Katrina. After 2001, the riverboat was attached by steel cables to the mooring system, and it was also connected to the shore-side source by electrical, computer, and telephone cables.
The Eleventh Circuit distinguished its decision from that of the Fifth Circuit’s in De La Rosa, 474 F.3d 185. It reasoned that the Fifth Circuit articulated an inappropriate test by focusing on the intent of the shipowner “rather than [on] whether the boat has been ‘rendered practically incapable of transportation or movement’ ” M/V Belle of Orleans, 535 F.3d at 1311 (quoting Stewart, 543 U.S. at 494, 125 S.Ct. at 1127). The Eleventh Circuit explained that courts should not consider the owner’s intentions regarding the vessel because owner’s intentions were analogous to the boat’s “purpose.” Id. Because the Supreme Court specifically rejected any definition of “vessel” that relies on such purpose, the owner’s intentions were irrelevant. Id.
The Eleventh Circuit pointed out that under the Fifth Circuit’s reasoning, a boat may enter and leave admiralty jurisdiction on the basis of state law and the individual thoughts of the boat owner. Id. Yet this conclusion is untenable:
As the Louisiana legislature demonstrated by its actions in 2001, state law can change. Further, if legal navigability is the test for vessel status, any ship with an expired Coast Guard certification becomes a non-vessel, and those working upon it and around it lose their protection under the Jones Act or the LHWCA. Such a result is clearly not what the Supreme Court intended.
Id. at 1311-12 (citation omitted).
I also note the thoughts of David Robertson, the W. Page Keeton Chair in Tort Law and University Distinguished Teaching Professor, University of Texas at Austin:
In 1 U.S.C. § 3 Congress states that “every description of watercraft ... capable of being used as a means of transportation on water” is a vessel.... [T]he Stewart Court effectively inserted the word “practically” into the statute. But it inserted it immediately before the word “capable,” not immediately before the word “used.” That is, the Stewart Court did not say that merely theoretical future use can prevent vessel status; rather it indicated that merely theoretical present capability can.
David W. Robertson, How the Supreme Court’s New Definition of “Vessel” is Affecting Seaman Status, Admiralty Jurisdiction, and Other Areas of Maritime Law, 39 J. Mar. L. & Com. 115, 135 (2008) (footnote omitted).[2]
The primary and binding legal authority for this court is 1 U.S.C. § 3. To be a vessel, the statute requires merely that a watercraft be capable of being used as a means of transportation on water. It is the jurisprudence, a secondary and nonbinding authority in this state, which added considerations of practicality to the statutory test. Among these secondary authorities, the Supreme Court’s guidance is certainly more persuasive than that of the Fifth Circuit. As dictated by the Supreme Court in Stewart, our focus should be on whether Crown has been “rendered practically incapable of transportation or movement.” 543 U.S. at 494, 125 S.Ct. at 1127 (emphasis added). While I agree *9 with the Fifth Circuit that Crown’s use as a means of transportation over water may be theoretical, I conclude that Crown’s capability of use as a means of transportation over water at the time of the accident was a practical one.
As the Eleventh Circuit correctly observed, a boat does not enter and leave admiralty jurisdiction on the basis of state law or the individual thoughts of the boat owner. M/V Belle of Orleans, 535 F.3d 1299. This is why that Crown has been attached to the dock since 2001 is of limited, if any, consequence. If St. Charles decides to sell Crown and move it somewhere, which it is in the process of doing at this very time, there would be no dispute that Crown would become a vessel immediately. Or, if Crown were to move with its crew to avoid a hurricane, for example, would there be any question regarding its status as a vessel if a member of its crew injured himself? Certainly, the question of whether something is or is not a vessel cannot depend on the subjective whim of the owner. Moreover, as the Eleventh Circuit also pointed out, a ship does not become a non-vessel if its Coast Guard certification expires. Id. For the same reason, that Crown may only conduct gambling dockside under the Louisiana statute has little bearing, if any, on whether it is a vessel.
Finally, I am aware of this court’s recent decision in Breaux v. St. Charles Gaming Company, Inc., 10-1349, 11-128 (La.App. 3 Cir. 6/22/11), 68 So.3d 684. Breaux relied heavily on the Fifth Circuit’s decision in De La Rosa 474 F.3d 185. As explained above, the De La Rosa court applied an incorrect test to determine whether a watercraft is a vessel. Thus, Justice Dennis’s sentiments are especially germane: “if a judge ignores a clearly applicable Code rule and follows another jurisdiction’s case, his example of using the wrong starting point or source of law should not be influential at all.” James L. Dennis, Interpretation & Application of the Civil Code & the Evaluation of Judicial Precedent, 54 La. L.Rev. 1, 15 (1993). I also note with approval and adopt Judge Saunders’s reasoning he so brilliantly articulated in his dissent in which I joined.
Moreover, the record in Breaux regarding the facts indicating that Crown is a vessel was not nearly as developed as it is in this case. This may have contributed to the conclusion in that case. Finally, as pointed out previously, Louisiana is a state where jurisprudence has no binding authority on the court. Thus, our main inquiry should be whether Crown is “capable of being used ... as a means of transportation on water.” 1 U.S.C. § 3. (Emphasis supplied).
The maintenance of a captain and a crew, the constant maintenance of navigational tools and equipment, the regular operation of the engines, all point to Crown’s practical capability of being used as a means of transportation over water. It is true that Crown is attached by various cables to land. Nevertheless, according to Crown’s captain, all of these attachments to land can be removed, and Crown can be ready to sail in less than one hour. Thus, neither Crown’s inherent characteristics nor external barriers (such as those that would exist if, for example, Crown were placed in dry dock) impede Crown’s practical capability of being used as a means of transportation over water. Based on these considerations, I find no error in the trial court’s conclusion that Crown is a vessel. The majority errs when it concludes otherwise.

(b) Did the Tort Occur on Navigable Water?

There is no dispute that Crown was floating on the Calcasieu River at the time Lemelle was served with allegedly exces *10 sive amounts of alcohol, which, allegedly, caused his injuries. Calcasieu River is a navigable waterway. See W. Cameron Port v. Lake Charles Harbor & Terminal Dist., 09-509 (La.App. 8 Cir. 5/12/10), 38 So.3d 577, writ denied, 10-1800 (La.11/19/10), 49 So.3d 393. Therefore, the location test is also satisfied in this alternative fashion.

(2) The Connection Test

The connection to traditional maritime activity test involves a consideration of whether (a) the incident had the potential to disrupt maritime commerce; and, (b) the general character of the tortfeasor’s activity giving rise to the incident had a substantial relationship to traditional maritime activity. Jerome B. Grubart, Inc., 513 U.S. 527, 115 S.Ct. 1043.

(a) Potential to Disrupt Maritime Commerce

This inquiry requires the consideration of the incident giving rise to the claim at an intermediate level of generality. Jerome B. Grubart, Inc., 513 U.S. 527, 115 S.Ct. 1043. This means that the court does not consider the particular facts of the case but examines the general features of the incident to determine whether this type of incident is likely to disrupt commercial activity. Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990).
The connection test was discussed ably and extensively in Quinn, 815 So.2d 963. There, the estate of a motorist who was killed in collision with an intoxicated casino patron sued the casino for providing excessive amounts of alcohol to the patron. Quoting Jerome B. Grubart, Inc., 513 U.S. at 538-39, 115 S.Ct. at 1051, and applying the intermediate level of generality, this court ruled that the provision of alcohol to passengers aboard a vessel without adequate supervision could have a disruptive effect on maritime commerce as intoxicated passengers fall overboard requiring search and rescue operations. Quinn, 815 So.2d 963.
Like the plaintiff in Quinn, Lemelle argues that he sustained injuries as a result of excessive provision of alcohol aboard Crown. Applying the intermediate level of generality, I have no difficulty concluding that there is a potential to disrupt maritime commerce. Thus, this prong of the connection test has been met.

(b) Substantial Relationship to Traditional Maritime Activity

The Quinn court also found the substantial relationship to the maritime activity: “[t]he duties owed by vessel owners to their passengers have long been found a traditional maritime concern.” Id. at 968 (citations omitted).
Having previously decided that Crown is a vessel, as in Quinn, 815 So.2d 963, Crown’s owners owed a duty to Lemelle to ensure his safety, which is a traditional maritime concern. Therefore, this prong of the connection test has also been met.
For the foregoing reasons, I dissent. The trial court’s summary judgment in favor of Thomas Lemelle should be affirmed.

. While the De La Rosa court states that the examination of whether a watercraft is a vessel needs to be performed in cases where the injury occurred on land, it applies this test in the case where the plaintiff "was a customer on board ... [Crown] when he tripped and fell.” 474 F.3d at 186 (emphasis added). By implication, the De La Rosa court applies the "vessel" test as opposed to the "navigable water” test even though the accident occurred on a navigable waterway. Therefore, for completeness purposes, I will address the issue of whether Crown is a vessel.

. See the article for an excellent summary of the history and jurisprudence on this subject.