# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-255

THOMAS LEMELLE

VERSUS

ST. CHARLES GAMING COMPANY, INC.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2009-1884
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**********

### MARC T. AMY
### JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Marc T. Amy, Shannon J. Gremillion and Phyllis M. Keaty, Judges.

**REVERSED AND RENDERED. REMANDED.**

Thibodeaux, Chief Judge, dissents and assigns written reasons.
Cooks, J., dissents for the reasons assigned by Judge Thibodeaux.


Robert E. Morgan
125 W. School Street
Lake Charles, LA 70605-1611
(337) 474-9625
COUNSEL FOR PLAINTIFF/APPELLEE:
    Thomas Lemelle

Brian D. Wallace
Evans Martin McLeod
Clay Bland, Jr.
Phelps Dunbar, L.L.P.
365 Canal Street - Suite 2000
New Orleans, LA 70130-6534
(504) 566-1311
COUNSEL FOR DEFENDANT/APPELLANT:
    St. Charles Gaming Company, Inc. d/b/a Isle of Capri Casino –
    Lake Charles

**James A. Blanco**
**Allen J. Mitchell, II**
**Mitchell & Blanco, LLC**
**Capital One Tower – Suite 1459**
**One Lakeshore Drive**
**Lake Charles, LA   70629**
**(337) 436-8686**
**COUNSEL FOR  PLAINTIFF/APPELLEE:**
        **Thomas Lemelle**

**James F. DeRosier**
**DeRosier Law Firm, L.L.C.**
**125 West School Street**
**Lake Charles, LA   70605**
**(337) 474-0820**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
        **Thomas Lemelle**

**AMY, Judge.**

The defendant gaming company claims that the trial court erred in granting a summary judgment in favor of the plaintiff, who was injured while intoxicated aboard a riverboat casino owned by the defendant. Although the trial court determined that the riverboat casino was a vessel for purposes of general maritime law in its ruling, the defendant again urges its own motion for summary judgment on the issue of vessel status. For the following reasons, we reverse the summary judgment entered by the trial court and render summary judgment in favor of the defendant. We remand for further proceedings.

### Factual and Procedural Background

The plaintiff, Thomas Lemelle, alleges that he sustained injury when he fell on a flight of stairs of the *M/V Crown Casino*, a riverboat casino owned by the defendant, St. Charles Gaming Company, Inc. It is undisputed that Mr. Lemelle was a patron of the *Crown* at the time of the April 22, 2008 accident and that subsequent testing revealed that he was intoxicated when he fell. It is also undisputed that the *Crown* has been moored dockside in Westlake, Louisiana since 2001.

Mr. Lemelle filed this suit, alleging negligence on the part of St. Charles in its service of alcohol to patrons.[1] He sought damages under the general maritime laws of the United States, asserting that the application of maritime law pre-empts the application of La.R.S. 9:2800.1, which limits liability for loss connected with the service of alcoholic beverages.

Thereafter, St. Charles filed an exception of no cause of action and/or motion for summary judgment asserting, among other things, that the *Crown* was not a vessel for maritime purposes and, therefore, Mr. Lemelle's claim must be dismissed. Mr.

---

[1] Mr. Lemelle also named St. Charles' insurer, American Guarantee and Liability Insurance Company, as a defendant.

Lemelle responded with a motion for summary judgment seeking a declaration that the *Crown* was a vessel for his maritime claim.

The parties' cross motions on the issue of vessel status focused on the fact that the *Crown* entered into its service as a riverboat casino carrying passengers on gaming cruises. However, in 2001, well before the 2008 accident at issue, the Louisiana legislature amended La.R.S. 27:65 to prohibit a licensee of a gaming boat in the locale at issue from conducting excursions. The parties' evidence indicates that the *Crown* has been docked since that time, with no further cruises conducted. Instead, the *Crown* has been moored in Westlake, secured to a concrete wharf by a system of lines and cables. It is serviced by landside connections for cable, electricity, surveillance, water, and sewage. The *Crown* is also connected to a shoreside pavilion by way of a guest entrance consisting of a large steel structure controlled by hydraulic ramps, which are attached to the pavilion.

Ultimately, the trial court heard arguments on the issue of whether the *Crown* continued to be a vessel after it ceased excursion operations in 2001.[2] The trial court granted the motion filed by Mr. Lemelle, finding the *Crown* to be a vessel and general maritime law applicable. It denied the motion for summary judgment filed by St. Charles. Recognizing the partial nature of the summary judgment entered, the trial court designated the partial final judgment as immediately appealable pursuant to La.Code Civ.P. art. 1915(B)(1).

St. Charles appeals.

## Discussion

In support of its contention that the *Crown* is not a vessel for maritime purposes, St. Charles points out that the *Crown* has been indefinitely docked at its

---

[2] Although St. Charles' pleading extended beyond the issue of vessel status, it appears that the hearing conducted and the ruling rendered were focused solely on the issue of vessel status. We consider that to be the sole issue before the court at this time.

Westlake location since the 2001 legislative amendment. It further points to jurisprudence indicating that this same riverboat casino has been found not to be a vessel. *See Breaux v. St. Charles Gaming Co., Inc.*, 10-1349 (La.App. 3 Cir. 6/22/11), 68 So.3d 684, *writ denied*, 11-1661 (La. 10/7/11), 71 So.3d 322 and *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185 (5th Cir. 2006). Further, it also asserts that this court should take notice that the *Crown*'s function is casino gaming rather than maritime commerce.

As explained in *Giorgio v. Alliance Operating Corp.*, 05-0002 (La. 1/19/06), 921 So.2d 58, a party asserting admiralty tort jurisdiction must establish that the incident 1) occurred on navigable waters, i.e., a maritime locale, and that 2) it had a maritime connection or flavor, i.e., a maritime nexus. In order to establish the location component of this requirement, the inquiry considered in the present case, the plaintiff must demonstrate "that the tort 'occurred on navigable water' or that 'an injury suffered on land was caused by a *vessel* on navigable water'". *De La Rosa*, 474 F.3d 187 (quoting *Strong v. B.P. Explor. & Prod., Inc.*, 440 F.3d 665 (5th Cir. 2006)). The parties question the *Crown*'s vessel status in this context.

As a starting point, we refer to 1 U.S.C. § 3 which provides that the term "'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."

The United States Supreme Court interpreted this definition of "vessel,"[3] in its determination of whether a dredge was a vessel for purposes of the Longshore and Harbor Workers' Compensation Act in light of its limited propulsion capabilities. *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 125 S.Ct. 1118 (2005). In conducting its analysis, the Supreme Court observed that "a watercraft is not 'capable of being used'

---

[3] *Stewart*'s interpretation of the term occurred within the context of the Longshore and Harbor Workers' Compensation Act.

for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered *practically incapable of transportation or movement.*" *Id*. at 1127 (emphasis added). The parties' arguments and evidence in this case center upon whether the *Crown* was practically incapable of transportation or movement at the time of the 2008 accident.

Notably, both a panel of the United States Court of Appeals, Fifth Circuit and a panel of this court have concluded that the *Crown* does not qualify as a vessel as interpreted in *Stewart.* In *De La Rosa*, 474 F.3d at 187, the Fifth Circuit observed that *Stewart* framed the critical inquiry as whether a watercraft's use "'as a means of transportation on water' is a practical possibility or merely a theoretical one.'" The Fifth Circuit concluded that the *Crown's* circumstances rendered it only theoretically capable of sailing and, therefore, it was not a vessel for purposes of admiralty jurisdiction. Instead, the Fifth Circuit observed that the *Crown* was:

> indefinitely moored to the land by lines tied to steel pilings. It receives water, telephone lines, sewer lines, cable television and data processing lines from land-based sources. It has not been used as a seagoing vessel since March 28, 2001, when it was moored at its present location on Lake Charles, and the Defendants do not intend to use it as such. Rather, their intent is to use it solely as an indefinitely moored floating casino. Its operations are entirely gaming-related and not maritime in nature.

*Id.* at 187.

Similarly, in *Breaux*, 68 So.3d 684, a panel of this court recently considered the *Crown's* status as a vessel in a case involving a 2004 accident.[4] The panel resolved the case in keeping with *De La Rosa* and remarked that the plaintiff "was injured while on a gaming boat permanently attached to the shore, not used in navigation, and not performing any traditional maritime activity." *Id.* at 687.

---

[4] The trial court decision now under review was rendered prior to the release of *Breaux* in June 2011.

4

It is of no small moment that the *Crown*, the riverboat casino at issue in this case, was the same riverboat casino involved in *De La Rosa* and in *Breaux*. While Mr. Lemelle contends that additional facts were developed in this case that were not available in the previous two cases, we do not find these facts warrant a different outcome. Chiefly, Mr. Lemelle argues that the evidence demonstrates the *Crown*'s actual capacity to navigate insofar as testimony and log entries reveal that the riverboat's engines were operated periodically around the time period of this accident. However, reviewing this evidence, we find no evidence warranting a departure from *De La Rosa* and *Breaux*.

Instead, the evidence leads to the conclusion that the *Crown* was *practically* incapable of transportation or movement as described in *Stewart*, 543 U.S. 481, 125 S.Ct. 1118. The *Crown* has been affixed in its dockside location, to some degree, since 2001 by lines and cables. It has not sailed since the 2001 legislation prohibiting it from conducting cruises or excursions. In fact, since 2001, its crew size has been reduced due to the lack of need to tie and untie the *Crown* onto the dock. According to the testimony of the *Crown*'s captain, the Coast Guard no longer inspects the *Crown*. Rather, at the time of the captain's deposition, inspections were performed by a state entity.

Mr. Lemelle asserts that the *Crown*'s practice of operating its engine and thrusters should be viewed as indicative of its actual capacity for transportation or movement. Similarly, its navigation equipment is intact. However, the practice referenced by Mr. Lemelle is not, in fact, used for navigation or transportation purposes. Instead, the *Crown*'s captain explained that the engines are used to ensure that the riverboat casino will remain affixed to the dock when large tankers are nearby. Similarly, the engines have been operated and the electrical sources have been disconnected during hurricanes when the boat has been evacuated. However,

5

according to the captain, these practices are for safety purposes. While the captain suggested that the numerous lines connecting the *Crown* to the land for utility purposes could be disconnected within a short period of time, these impediments undermine the practicality of the *Crown* returning to service as a means of transportation or movement.

We further note that both *De La Rosa* and *Breaux* commented upon the interplay of La.R.S. 27:65 and the physical barriers to movement. Pursuant to that legislation, the *Crown*, as a gaming licensee, may only conduct its business while docked. It may not conduct cruises or excursions. It is appropriate to consider this legislation as bearing on the question of whether, under these facts, the *Crown* is practically capable or incapable of either transportation or movement uses.

Furthermore, and while we follow *De La Rosa* and *Breaux* as authoritative jurisprudence, we are aware that, in *Board of Commissioners of the Orleans Levee Dist. v. M/V BELLE OF ORLEANS*, 535 F.3d 1299 (11th. Cir. 2008), the United States Court of Appeals, Eleventh Circuit rejected the reasoning of *De La Rosa*, instead finding that the Fifth Circuit inappropriately focused on the intent of the shipowner. As an intermediate state appellate court, we are mindful that this court is situated within the geographical confines of the Fifth Circuit. We also note that both *De La Rosa* and *Breaux* only reference the legislation and the owner's intent as one of several factors in determination of whether the riverboat casino is practically incapable of movement or transportation. We find no reason to deviate from that reasoning here. Rather, we conclude that *De La Rosa* and *Breaux* are sufficiently consistent with 1 U.S.C. § 3, as interpreted by the Supreme Court in *Stewart*, to adhere to those decisions in light of the facts developed in this case.

For these reasons, we reverse the trial court's determination that the *Crown* was a vessel for general maritime law purposes and its entry of a partial final judgment in

this regard.  Accordingly, we find it appropriate to grant St. Charles' motion for summary judgment insofar as it sought a declaration that, in this case, the *Crown* is not a vessel for general maritime law purposes.  As the parties' presentation to the trial court focused on this issue, we remand this matter for further proceedings consistent with this opinion rather than granting St. Charles' request that Mr. Lemelle's claim be dismissed.[5]

## DECREE

The partial summary judgment entered in favor of the plaintiff, Thomas Lemelle, is reversed.  The denial of the motion for summary judgment filed by the defendant, St. Charles Gaming Company, Inc., is also reversed.  Summary judgment is rendered in favor of St. Charles Gaming Company, Inc., declaring that the *M/V Crown Casino* is not a vessel for general maritime purposes under the facts of this case.  This matter is remanded for further proceedings consistent with this opinion. Costs of this proceeding are assessed to Mr. Lemelle.

**REVERSED AND RENDERED.  REMANDED .**

---

[5] Again, the parties' evidence and argument focused upon the *Crown*'s status as a vessel.  The trial court's judgment did as well.  To the extent that St. Charles filed an exception of no cause of action and a motion for summary judgment that extended beyond this issue, we do not consider those issues.  Accordingly, we remand this matter so that the parties and the trial court might consider any issues and procedural questions that remain.

THOMAS LEMELLE

VERSUS

ST. CHARLES GAMING COMPANY, INC.

**THIBODEAUX, Chief Judge, dissenting.**

These facts are undisputed. Crown was constructed as a completely functional riverboat. Prior to 2001, the period during which Louisiana laws prohibited dockside gambling, Crown with passengers regularly cruised the waters. When in 2001 the gaming laws changed to allow dockside gambling, Crown was moored on Calcasieu River, and it has remained moored ever since.

Crown is connected to an adjacent concrete wharf by nylon mooring lines and steel cables. Crown is also connected to land by utility lines that supply electricity, water, telephone, sewerage, cable television, and computer access. There is also a guest entrance walkway—a steel structure controlled by hydraulic ramps attached to the land-based pavilion. Despite all of the above-described attachments to land, *Crown can be ready to sail on its own in less than one hour*.

Crown has a captain and a marine crew who maintain the riverboat in proper operating order. All of the navigational tools and equipment as well as Crown's engines are constantly checked and maintained in proper working order. In short, Crown is a completely functional riverboat.

At the time of the incident, as was required by then-existing legislation, Crown held a certificate of inspection issued by the United States Coast Guard (USCG). Crown floats on its own in the Calcasieu River. In fact, Crown

can and, at times, does operate under its own power free from the shore-side systems for as long as eight hours.

Once or twice a week, the Crown's captain activates and operates both the port and starboard main engines of the vessel. This is done to hold Crown against its dock because when large ocean-going ships dock at or leave from the adjacent shipyard, it creates a significant disturbance of the waters.

## Admiralty Jurisdiction

Admiralty jurisdiction in tort cases is conferred by 28 U.S.C. § 1333(1). *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.Ct. 1043 (1995); *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185 (5th Cir. 2006). The party seeking admiralty jurisdiction "must satisfy conditions both of location and of connection with maritime activity." *Strong v. B.P. Exploration & Prod., Inc.* 440 F.3d 665, 669 (5th Cir. 2006) (citation omitted). There are two alternative ways to satisfy the location test: "the plaintiff must show that the tort 'occurred on navigable water' or that an 'injury suffered on land was caused by a *vessel* on navigable water.'" *De La Rosa*, 474 F.3d at 187 (citation omitted). The connection test involves two additional inquiries: (a) whether the incident had the potential to disrupt maritime commerce; and, (b) whether the general character of the tortfeasor's activity giving rise to the incident had a substantial relationship to traditional maritime activity. *Jerome B. Grubart, Inc.,* 513 U.S. 527, 115 S.Ct. 1043; *Quinn v. St. Charles Gaming Co., Inc*., 01-794 (La.App. 3 Cir. 2/6/02), 815 So.2d 963, *writ denied*, 02-694 (La. 4/12/02), 813 So.2d 412.

The first inquiry is whether Crown is a vessel.[1] The next inquiry is whether the location test can be satisfied by determining whether the tort occurred

---

[1]While the *De La Rosa* court *states* that the examination of whether a watercraft is a vessel needs to be performed in cases where the injury occurred on land, it *applies* this test in the

2

on a navigable waterway.  Finally, it is necessary to examine whether the test of connection to traditional maritime activity has been satisfied.

### *(1) The Location Test*

### *(a) Is Crown a Vessel?*

There are two sources of law in Louisiana:  legislation and custom, with legislation superseding custom in every instance.  *Doerr v. Mobil Oil Corp.*, 00-947 (La. 12/19/00), 774 So.2d 119 (citing La.Civ.Code arts. 1, 3).  "Judicial decisions, on the other hand, are not intended to be an authoritative source of law in Louisiana."  *Id.* at 128 (citing A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW SYSTEM § 35 (1977)).  Because "'one of the fundamental rules of [the civil law tradition] is that a tribunal is never bound by the decisions which it formerly rendered:  it can always change its mind,' 1 Marcel Planiol, Treatise on the Civil Law § 123, (La. State Law Inst. trans.1959) (12th ed.1939), prior holdings by this court are persuasive, not authoritative, expressions of the law."  *Id.* at 128-29 (citing A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW SYSTEM § 35 (1977)).  Thus, "a prior judicial (mis)construction of a statute does not '*insulate*' the Louisiana judge . . . from returning to the legislation itself to ascertain its correct meaning and application."  Albert Tate, Jr., *Civilian Methodology in Louisiana*, 44 TUL. L. REV. 673, 678 (1976).

As Justice Dennis explained, in Louisiana, legislation "is the primary source of law, and precedent serves merely as an example of a prior judge's interpretation and application of legislated law."  James L. Dennis, *Interpretation & Application of the Civil Code & the Evaluation of Judicial Precedent*, 54 LA. L. REV. 1, 3 (1993).  Thus, "[i]t should be evident that the common-law or case-law

---

case where the plaintiff "was a customer *on board* . . . [Crown] when he tripped and fell."  474 F.3d at 186 (emphasis added).  By implication, the *De La Rosa* court applies the "vessel" test as opposed to the "navigable water" test even though the accident occurred on a navigable waterway.  Therefore, for completeness purposes, I will address the issue of whether Crown is a vessel.

theory of precedent is incompatible in many ways with the legal method of deciding a case . . . ." *Id.* at 14. Furthermore, the civil law method should be applied to determine "whether the case should be imitated in a subsequent decision." *Id.* at 15. Therefore, "if a judge ignores a clearly applicable Code rule and follows another jurisdiction's case, his example of using the wrong starting point or source of law should not be influential at all." *Id.*

For the purposes of admiralty jurisdiction, "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. *See also Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 125 S.Ct. 1118 (2005). "A watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically *incapable* of transportation or movement." *Id.*, 543 U.S. at 494, 125 S.Ct. at 1127 (emphasis added). Even though 1 U.S.C. § 3 requires that the watercraft is capable of being used as a means of transportation on water, "[i]t does not require that a watercraft be used *primarily* for that purpose." *Stewart*, 543 U.S. at 495, 125 S.Ct. at 1128 (citation omitted).

A ship does not move in and out of admiralty jurisdiction depending on whether the ship is at an anchor, docked for loading or unloading, or berthed for minor repairs. *Id.* Similarly, ships that are taken permanently out of the water do not remain vessels because of the remote possibility that they may sail again in the future. *Id.*

The following cases provide some guidance as to whether something is or is not a vessel. A dredge, a massive floating platform that had a captain and a crew, navigational lights, ballast tanks, and a crew dining area, but lacked self-propulsion and was moved by a tugboat, was a vessel for maritime law purposes

when it lay idle because one of its scows had suffered an engine malfunction and the other was at sea. *Stewart*, 543 U.S. 481, 125 S.Ct. 1118.

In *De La Rosa*, 474 F.3d 185, a case involving the same riverboat whose vessel status is disputed in our case, the court held that Crown was not a vessel. The Fifth Circuit reasoned that while Crown "was still physically capable of sailing, such a *use* was merely theoretical" because "Defendants *do not intend* to use it" as a sailing vessel and, instead, intend "to use it solely as an indefinitely moored floating casino." *Id.* at 187 (emphasis added).

A riverboat casino that conducted gaming cruises on Lake Pontchartrain until 2001 and conducted all gambling dockside from 2001 until Hurricane Katrina in 2005, was held to be a vessel for the purposes of establishing admiralty jurisdiction. *Bd. Of Comm'rs of Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299 (11th Cir. 2008). There, the vessel was subject to USCG certification and inspection. The riverboat had a captain and a crew, and they maintained the boat's engines, generators, and equipment in working order at all times prior to Katrina. After 2001, the riverboat was attached by steel cables to the mooring system, and it was also connected to the shore-side source by electrical, computer, and telephone cables.

The Eleventh Circuit distinguished its decision from that of the Fifth Circuit's in *De La Rosa*, 474 F.3d 185. It reasoned that the Fifth Circuit articulated an inappropriate test by focusing on the intent of the shipowner "rather than [on] whether the boat has been 'rendered practically incapable of transportation or movement.'" *M/V Belle of Orleans*, 535 F.3d at 1311 (quoting *Stewart*, 543 U.S. at 494, 125 S.Ct. at 1127). The Eleventh Circuit explained that courts should not consider the owner's intentions regarding the vessel because owner's intentions were analogous to the boat's "purpose." *Id.* Because the Supreme Court

5

specifically rejected any definition of "vessel" that relies on such purpose, the owner's intentions were irrelevant. *Id.*

The Eleventh Circuit pointed out that under the Fifth Circuit's reasoning, a boat may enter and leave admiralty jurisdiction on the basis of state law and the individual thoughts of the boat owner. *Id.* Yet this conclusion is untenable:

> As the Louisiana legislature demonstrated by its actions in 2001, state law can change. Further, if legal navigability is the test for vessel status, any ship with an expired Coast Guard certification becomes a non-vessel, and those working upon it and around it lose their protection under the Jones Act or the LHWCA. Such a result is clearly not what the Supreme Court intended.

*Id.* at 1311-12 (citation omitted).

I also note the thoughts of David Robertson, the W. Page Keeton Chair in Tort Law and University Distinguished Teaching Professor, University of Texas at Austin:

> In 1 U.S.C. § 3 Congress states that "every description of watercraft . . . capable of being used as a means of transportation on water" is a vessel. . . . [T]he *Stewart* Court effectively inserted the word "practically" into the statute. But it inserted it immediately before the word "capable," not immediately before the word "used." That is, the *Stewart* Court did not say that merely theoretical *future use* can prevent vessel status; rather it indicated that merely theoretical *present capability* can.

David W. Robertson, *How the Supreme Court's New Definition of "Vessel" is Affecting Seaman Status, Admiralty Jurisdiction, and Other Areas of Maritime Law,* 39 J. MAR. L. & COM. 115, 135 (2008) (footnote omitted).[2]

The primary and binding legal authority for this court is 1 U.S.C. § 3. To be a vessel, the statute requires merely that a watercraft be capable of being used as a means of transportation on water. It is the jurisprudence, a secondary and

---

[2]See the article for an excellent summary of the history and jurisprudence on this subject.

non-binding authority in this state, which added considerations of practicality to the statutory test. Among these secondary authorities, the Supreme Court's guidance is certainly more persuasive than that of the Fifth Circuit. As dictated by the Supreme Court in *Stewart*, our focus should be on whether Crown has been "rendered practically *incapable* of transportation or movement." 543 U.S. at 494, 125 S.Ct. at 1127 (emphasis added). While I agree with the Fifth Circuit that Crown's *use* as a means of transportation over water may be theoretical, I conclude that Crown's *capability* of use as a means of transportation over water at the time of the accident was a practical one.

As the Eleventh Circuit correctly observed, a boat does not enter and leave admiralty jurisdiction on the basis of state law or the individual thoughts of the boat owner. *M/V Belle of Orleans*, 535 F.3d 1299. This is why that Crown has been attached to the dock since 2001 is of limited, if any, consequence. If St. Charles decides to sell Crown and move it somewhere, which it is in the process of doing at this very time, there would be no dispute that Crown would become a vessel immediately. Or, if Crown were to move with its crew to avoid a hurricane, for example, would there be any question regarding its status as a vessel if a member of its crew injured himself? Certainly, the question of whether something is or is not a vessel cannot depend on the subjective whim of the owner. Moreover, as the Eleventh Circuit also pointed out, a ship does not become a non-vessel if its Coast Guard certification expires. *Id.* For the same reason, that Crown may only conduct gambling dockside under the Louisiana statute has little bearing, if any, on whether it is a vessel.

Finally, I am aware of this court's recent decision in *Breaux v. St. Charles Gaming Company, Inc.*, 10-1349, 11-128 (La.App. 3 Cir. 6/22/11), __So.3d__. *Breaux* relied heavily on the Fifth Circuit's decision in *De La Rosa* 474 F.3d 185. As explained above, the *De La Rosa* court applied an incorrect test

7

to determine whether a watercraft is a vessel. Thus, Justice Dennis's sentiments are especially germane: "if a judge ignores a clearly applicable Code rule and follows another jurisdiction's case, his example of using the wrong starting point or source of law should not be influential at all." James L. Dennis, *Interpretation & Application of the Civil Code & the Evaluation of Judicial Precedent*, 54 LA. L. REV. 1, 15 (1993). I also note with approval and adopt Judge Saunders's reasoning he so brilliantly articulated in his dissent in which I joined.

Moreover, the record in *Breaux* regarding the facts indicating that Crown is a vessel was not nearly as developed as it is in this case. This may have contributed to the conclusion in that case. Finally, as pointed out previously, Louisiana is a state where jurisprudence has no binding authority on the court. Thus, our main inquiry should be whether Crown is "*capable* of being used . . . as a means of transportation on water." 1 U.S.C. § 3. (Emphasis supplied).

The maintenance of a captain and a crew, the constant maintenance of navigational tools and equipment, the regular operation of the engines, all point to Crown's practical capability of being used as a means of transportation over water. It is true that Crown is attached by various cables to land. Nevertheless, according to Crown's captain, all of these attachments to land can be removed, and Crown can be ready to sail in less than one hour. Thus, neither Crown's inherent characteristics nor external barriers (such as those that would exist if, for example, Crown were placed in dry dock) impede Crown's practical capability of being used as a means of transportation over water. Based on these considerations, I find no error in the trial court's conclusion that Crown is a vessel. The majority errs when it concludes otherwise.

8

## (b) Did the Tort Occur on Navigable Water?

There is no dispute that Crown was floating on the Calcasieu River at the time Lemelle was served with allegedly excessive amounts of alcohol, which, allegedly, caused his injuries. Calcasieu River is a navigable waterway. *See W. Cameron Port v. Lake Charles Harbor & Terminal Dist.*, 09-509 (La.App. 3 Cir. 5/12/10), 38 So.3d 577, *writ denied*, 10-1800 (La. 11/19/10), 49 So.3d 393. Therefore, the location test is also satisfied in this alternative fashion.

## (2) The Connection Test

The connection to traditional maritime activity test involves a consideration of whether (a) the incident had the potential to disrupt maritime commerce; and, (b) the general character of the tortfeasor's activity giving rise to the incident had a substantial relationship to traditional maritime activity. *Jerome B. Grubart, Inc.,* 513 U.S. 527, 115 S.Ct. 1043.

## (a) Potential to Disrupt Maritime Commerce

This inquiry requires the consideration of the incident giving rise to the claim at an intermediate level of generality. *Jerome B. Grubart, Inc.,* 513 U.S. 527, 115 S.Ct. 1043. This means that the court does not consider the particular facts of the case but examines the general features of the incident to determine whether this type of incident is likely to disrupt commercial activity. *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892 (1990).

The connection test was discussed ably and extensively in *Quinn*, 815 So.2d 963. There, the estate of a motorist who was killed in collision with an intoxicated casino patron sued the casino for providing excessive amounts of alcohol to the patron. Quoting *Jerome B. Grubart, Inc.,* 513 U.S. at 538-39, 115 S.Ct. at 1051, and applying the intermediate level of generality, this court ruled that the provision of alcohol to passengers aboard a vessel without adequate

9

supervision could have a disruptive effect on maritime commerce as intoxicated passengers fall overboard requiring search and rescue operations. *Quinn*, 815 So.2d 963.

Like the plaintiff in *Quinn*, Lemelle argues that he sustained injuries as a result of excessive provision of alcohol aboard Crown. Applying the intermediate level of generality, I have no difficulty concluding that there is a potential to disrupt maritime commerce. Thus, this prong of the connection test has been met.

### (b) Substantial Relationship to Traditional Maritime Activity

The *Quinn* court also found the substantial relationship to the maritime activity: "[t]he duties owed by vessel owners to their passengers have long been found a traditional maritime concern." *Id.* at 968 (citations omitted).

Having previously decided that Crown is a vessel, as in *Quinn*, 815 So.2d 963, Crown's owners owed a duty to Lemelle to ensure his safety, which is a traditional maritime concern. Therefore, this prong of the connection test has also been met.

For the foregoing reasons, I dissent. The trial court's summary judgment in favor of Thomas Lemelle should be affirmed.